# United States District Court
## for the Northern District of Oklahoma

---

Case No. 23-cv-209-JDR-MTS

---

TAMMY McKEE, *individually and as personal representative of the Estate of Michael Wade McKee*,

*Plaintiff*,

*versus*

CITY OF SKIATOOK, OKLAHOMA; LEIANNE RICHARDS,

*Defendants*.

---

## OPINION AND ORDER

---

On May 29, 2022, City of Skiatook Police Officer Leianne Richards pursued a speeding motorcyclist from Skiatook, Oklahoma to Tulsa, Oklahoma. The chase ended tragically: Officer Richards's patrol car collided with the motorcycle, causing the death of its rider, Michael Wade McKee. Plaintiff Tammy McKee, acting on her own behalf and as representative of Mr. McKee's estate, sued Officer Richards and the City of Skiatook for violations of state and federal law. Dkt. 2. The Court previously dismissed Plaintiff's state-law claims against the City [Dkt. 22], and Defendants have moved for summary judgment on Plaintiff's remaining claims. Dkts. 62, 63. For the reasons set forth below, their motions are granted.

I[1]

Officer Leianne Richards of the Skiatook Police Department was driving her marked patrol vehicle through a residential neighborhood when an

---

[1] The facts set forth in this section are undisputed unless otherwise noted.

No. 23-cv-209

individual flagged her down and notified her that a motorcycle or dirt bike had recently sped through the area. Dkt. 62 at 11 (statements of fact nos. 3, 5).[2] Officer Richards patrolled the area and, soon afterward, encountered a motorcyclist who was later identified as Michael Wade McKee. According to Officer Richards's radar, Mr. McKee was driving sixty-eight miles per hour— well over the residential area's twenty-five miles per hour limit. *Id.* (statement of fact no. 7).[3] Officer Richards activated her lights and siren, but Mr. McKee did not pull over. Instead, he sped away, running several stop signs in the process. Officer Richards pursued. *Id.* at 12 (statements of fact nos. 8, 9).

Mr. McKee turned onto Highway 11, and Officer Richards continued to pursue him. *Id.* (statement of fact no. 9). She followed Mr. McKee out of Skiatook, through Sperry, and into Tulsa where Highway 11 transitions into a four-lane street known as Peoria Avenue. *Id.* (statement of fact no. 13); Dkts. 62-8 at 7, 62-10 at 4 (discussing change from Highway 11 to Peoria Avenue).[4] Traffic was "light" during the pursuit. *Id.* (statement of fact no. 10). Although Mr. McKee reached speeds of more than 100 miles per hour during the eighteen-mile chase, there were no collisions or near-collisions with vehicles or pedestrians until the pursuit's sudden and deadly end. *Id.* (statement of fact no. 14).

---

[2] All citations utilize CMECF pagination.

[3] Plaintiff denies that Mr. McKee was speeding but provides no evidence to dispute that fact. Dkt. 77 at 12 (response to statement of fact no. 7). Accordingly, the Court accepts this fact as true for purposes of Defendants' motions. *See* N.D. Okla. Civ. R. 56-1 ("All material facts set forth in the statement of the material facts of the movant shall be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of material facts of the opposing party, using the procedures set forth in this rule.").

[4] Plaintiff objects to Defendants' contention that Mr. McKee was "fleeing" but does not otherwise object to statement of fact no. 13. Dkt. 77 at 12 (response to statement of fact no. 13). The distinction is immaterial to the Court's opinion.

No. 23-cv-209

Officer Richards maintained radio contact with her supervisor, Sergeant Mark Dressler, for the duration of the chase. Dkt. 62 at 12 (statements of fact nos. 8, 11).[5] Sgt. Dressler instructed Officer Richards to end the pursuit if she did not catch Mr. McKee by the time she reached Highway 64. *Id.* at 13 (statement of fact no. 19). Officer Richards did not acknowledge the command, nor did she stop the pursuit when she crossed Highway 64. *Id.* (statement of fact no. 21).[6] Instead, she continued to follow Mr. McKee southbound on Peoria Avenue through downtown Tulsa and into a residential area, crossing several lighted intersections in the process. Dkt. 62 at 14 (statement of fact no. 26); Dkt. 77 at 24, 38 (asserting that the chase continued into the "heart of residential Tulsa," passing a synagogue and church prior to the collision).

Unbeknownst to Mr. McKee and Officer Richards, a bridge just south of the intersection of 31st Street and Peoria Avenue was undergoing construction, and a portion of Peoria Avenue was therefore closed. Dkt. 62 at 14 (statement of fact no. 28). Mr. McKee and Officer Richards drove into the construction zone. To do so, they passed several type III barricades with flashing lights, crossed into the northbound lane (the only lane not blocked by a barricade), and passed signs indicating that the road was closed, the bridge was out, and traffic should use alternate routes. *Id.* at 14-15 (statements of fact nos. 28-34).

At this point, the parties' stories diverge: Officer Richards asserts that, when she drove into the construction zone, she saw a semi-trailer parked in the northbound lane and lost sight of Mr. McKee. She applied her brakes and

---

[5] Plaintiff does not admit or deny Officer Richards's statement of fact no. 11. Dkt. 77 at 12. The Court accepts that statement as true. *See* N.D. Okla. Civ. R. 56-1.

[6] According to Officer Richards, she was unaware that she had passed Highway 64, which crosses underneath Highway 11/Peoria Avenue. Peoria Avenue does not have any on-ramps or off-ramps onto Highway 64, and there are no signs posted to indicate that Peoria Avenue crosses over the highway. Dkt. 62 at 13-14 (statements of fact nos. 22-24).

No. 23-cv-209

swerved to avoid hitting the trailer, but she sideswiped it before striking Mr. McKee's motorcycle. *Id.* at 14-16, 18 (statements of fact nos. 35, 40, 45). Officer Richards asserts that she did not intend to hit Mr. McKee and that she was focused solely on avoiding the trailer when she collided with his motorcycle. *See* Dkt. 62 at 18 (statement of fact no. 45); Dkt. 62-3 at 94 (testifying that she "lost sight" of Mr. McKee just after he went through the barriers). Plaintiff, however, argues that Officer Richards intentionally struck Mr. McKee to prevent his escape.[7]

Both parties agree that Officer Richards's vehicle collided with Mr. McKee's motorcycle while he was still on it. Dkt. 62 at 16 (statement of fact no 39); Dkt. 77 at 13.[8] They also agree Mr. McKee "had either stopped his motorcycle or slowed down to a pace less than [Officer Richards] was traveling" at the time of the collision. Dkt. 62 at 16 (statement of fact no 39); Dkt. 77 at 12.[9] When Officer Richards's vehicle struck the motorcycle, Mr. McKee

---

[7] In support of her position, Plaintiff points to evidence that Officer Richards was accelerating and gaining ground on Mr. McKee prior to the collision; that no skid marks were found at the scene; that Officer Richards struck Mr. McKee from behind while he was in an upright, seated position; and that Officer Richards has taken inconsistent positions as to whether she hit Mr. McKee with her police vehicle. Dkt. 77 at 15-16 (plaintiff's statements of fact nos. 1, 6-8); *id.* at 11-12.

[8] Officer Richards goes on to state that Mr. McKee's decision to slow down is what "caus[ed] her to run into the back of his motorcycle." Dkt. 62 at 16 (statement of fact no. 39). Plaintiff does not dispute this portion of Officer Richards's statement. *See* Dkt. 77 at 12. But Plaintiff does dispute Officer Richards's claim that the collision was an accident, and she provides evidentiary support for her claim that Officer Richards acted intentionally. *See* Dkt. 77 at 13 (response to statement of fact no. 42); *id.* at 14 (additional statements of fact nos. 1, 6-8). The Court will treat the second half of statement of fact no. 39 as disputed.

[9] The Court has found no evidence in the record to support the conclusion that Mr. McKee's vehicle was stopped. The evidence cited by Plaintiff demonstrates only that Mr. McKee must have been travelling at a minimum of five miles per hour to remain upright. The distinction is immaterial to the Court's analysis. Even if Mr. McKee had stopped, Plaintiff has not argued, and there is no evidence from which a jury could find, that Officer Richards could have known that he was stopped or in the process of stopping in time to modify her behavior.

No. 23-cv-209

was thrown from it. He sustained fatal injuries and died at the scene. Dkt. 62
at 18 (statement of fact no. 47).

The City required its officers to undergo specific training, including
mandatory basic academy training and certification by the Oklahoma Counsel
on Law Enforcement Education and Training. Dkt. 63 at 9 (statement of fact
no. 1). Officers were required to read, understand, and comply with the City's
policies and procedures (which included policies governing the use of force
and vehicle pursuits) and complete daily training bulletins relevant to those
policies and procedures. *Id.* (statements of fact nos. 1, 2);[10] Dkt. 63-1. In the
five years prior to the accident at issue, City police officers had been involved
in sixteen or fewer high-speed pursuits outside the city limits. Dkt. 63 at 11
(statement of fact no. 5); Dkt. 89 at 10-11. Of those, six were terminated by
the involved officer, three resulted in the driver being apprehended after the
driver's vehicle became stuck or disabled, and one ended when the Oklahoma
Highway Patrol used stop sticks to disable a vehicle. Dkt. 63 at 11 (statement
of fact no. 5).[11]

Plaintiff, on behalf of herself and Mr. McKee's estate, sued Officer
Richards and the City. In her complaint, Plaintiff alleges that (1) both Officer
Richards and the City are liable under 42 U.S.C. § 1983 for unlawful arrest
and excessive use of force in violation of Mr. McKee's Fourth Amendment
rights; (2) the City caused the Fourth Amendment violations by failing to
train and supervise Officer Richards; and (3) Officer Richards is liable for the
assault and battery of Mr. McKee. Dkt. 2.[12] Plaintiff also argues in her

---

[10] Plaintiff claims she cannot admit or deny these statements of fact. Dkt. 89 at 12.
Because she does not provide any evidence to dispute these factual assertions, the Court
accepts them as true. *See* N.D. Okla. Civ. R. 56-1.

[11] Plaintiff does not admit these facts. Dkt. 89 at 14. Because she provides no con-
trary evidence, the Court accepts the City's facts as true. *See* N.D. Okla. Civ. R. 56-1.

[12] Plaintiff originally asserted state-law claims against the City, but those claims
have since been dismissed. *See* Dkt. 22.

No. 23-cv-209

response that Officer Richards was deliberately indifferent to Mr. McKee's health and safety in violation of the Fourteenth Amendment. *See* Dkt. 77 at 35-36. Defendants argue that the evidence is insufficient to permit a jury to find in Plaintiff's favor with respect to any of these claims, and that Officer Richards is entitled to qualified immunity on Plaintiff's constitutional claims.

## II

Summary judgment may only be entered if the moving party can show that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). To meet this burden, the moving party cannot rely on mere allegations but must point to evidence of record supporting its claim that there are no genuine material factual disputes. Fed. R. Civ. P. 56(c)(1). *See Donahue v. Wihongi*, 948 F.3d 1177, 1187 (10th Cir. 2020) (citing *Lindsey v. Hyler*, 918 F.3d 1109, 1113 (10th Cir. 2019)) (acknowledging that the moving party cannot rely on allegations but must establish facts that would allow a jury to find in its favor). If the moving party satisfies this obligation, the non-moving party must then point to evidence of record establishing the existence of a material disputed fact for trial. Fed. R. Civ. P. 56(c)(1).

When a defendant moves for summary judgment on qualified immunity grounds, as Officer Richards does here, the Court applies the standard above while considering the "substantive burden[] on the underlying issue[]" of qualified immunity. *Rife v. Oklahoma Dep't of Pub. Safety*, 854 F.3d 637, 643 (10th Cir. 2017). Once qualified immunity is asserted, the plaintiff bears the burden of "demonstrat[ing] that a reasonable factfinder could find facts supporting the violation of a constitutional right that had been clearly established at the time of the violation." *Id.* (citing *Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014)) (footnote omitted). Once "this burden is met, the defendant must show that (1) there are no genuine issues of material fact and (2) the defendant is entitled to judgment as a matter of law." *Id.* (citing *Koch v. City of Del City*, 660 F.3d 1228, 1238 (10th Cir. 2011)).

No. 23-cv-209

Regardless of the legal grounds underlying a summary-judgment motion, the reviewing court must view all facts and draw all reasonable inferences in favor of the non-moving party. *Lindsey*, 918 F.3d at 1113. Summary judgment is appropriate only if, when the evidence is viewed and construed in this way, there are no material factual disputes that would permit a jury to rule in the non-moving party's favor and the moving party is entitled to judgment as a matter of law. *Id.*

### III

The Court begins with Plaintiff's federal claims against Officer Richards. Officer Richards has invoked the affirmative defense of qualified immunity. *See* Dkt. 14 at 3-4. Plaintiff therefore bears the initial burden of pointing to facts that, if true, would (1) demonstrate that Officer Richards violated Mr. McKee's federal constitutional or statutory rights, and (2) it was clearly established at the time of the incident that Officer Richards's conduct was unlawful. *See D.C. v. Wesby*, 583 U.S. 48, 62-63 (2018); *Sawyers v. Norton*, 962 F.3d 1270, 1282 (10th Cir. 2020). This Court "may address either prong of the inquiry first and need not address both if one is dispositive." *Heard v. Dulayev*, 29 F.4th 1195, 1203 (10th Cir. 2022) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

### A

The Court turns first to Plaintiff's claim that Officer Richards illegally arrested Mr. McKee. This claim appears to be, in large part, duplicative of Plaintiff's excessive-force claim.[13] But there is at least some suggestion in Plaintiffs' complaint and brief that Officer Richards violated Mr. McKee's federal rights by arresting him without authority or probable cause to do so.

---

[13] *See* Dkt. 2 at ¶¶ 16, 18 (alleging that the high-speed pursuit and decision to hit Mr. McKee to effect his arrest constituted an unreasonable use of deadly force); Dkt. 77 at 22, 25, 32 (arguing that the use of deadly force was not reasonable under the circumstances).

No. 23-cv-209

*See* Dkt. 2 at ¶ 16; Dkt. 77 at 34-35.[14] To the extent Plaintiff's complaint sets forth an illegal-arrest claim that is distinct from her use-of-force claim, Defendants are entitled to summary judgment on that claim.

It was Plaintiff's burden to point to facts that, if true, would demonstrate that Mr. McKee was arrested in violation of his federal constitutional or statutory rights. *Sawyers*, 962 F.3d at 1282. But Plaintiff has failed to point to any facts suggesting that Officer Richards lacked probable cause to arrest Mr. McKee. *See generally* Dkt. 77.[15] She has likewise failed to point to any facts suggesting that the arrest itself (independent of the use of force) violated Mr. McKee's federal rights. *Id.* And the facts of record establish that Officer Richards observed Mr. McKee speeding in a residential area, confirmed with her radar that he was speeding, and signaled for Mr. McKee to pull over before pursuing him for failing to do so. *See* Dkt. 62 at 11-12. These facts would preclude a jury from finding that Officer Richards lacked probable cause to stop Mr. McKee as a general matter. *See United States v. Morgan*, 855 F.3d 1122, 1123 (10th Cir. 2017) ("A traffic stop is a seizure but is 'reasonable where the police have probable cause to believe that a traffic violation has occurred.'" (quoting *Whren v. United States*, 517 U.S. 806, 809-10 (1996))).

Plaintiff also bore the burden of pointing to case law clearly establishing that, at the time of the incident, Officer Richards was on notice that the arrest itself (independent of the force used to effect it) violated Mr. McKee's federal rights. *Sawyers*, 962 F.3d at 1282. Plaintiff failed to meet this

---

[14] The question of whether Officer Richards intentionally "arrested" Mr. McKee is disputed. The Court addresses that dispute in Section III(B), *infra*, and assumes for purposes of this claim that Officer Richards intentionally arrested Mr. McKee.

[15] When responding to Officer Richards's arguments on the illegal-arrest claim, Plaintiff focuses primarily on the nature and extent of the force used, rather than the legality of the arrest independent of that use of force. *E.g.,* Dkt. 77 at 34-35 (responding to Officer Richards's arguments that she had authority to take Mr. McKee into custody by stating that Officer Richards "d[id] not have the right to inflict the death penalty on a traffic offender"); *id.* at 41 (arguing about "deadly force" in response to illegal arrest claim).

No. 23-cv-209

obligation. At most, Plaintiff argues that a police officer's authority generally "cannot extend beyond his jurisdiction." Dkt. 77 at 35. But she cites only a single Oklahoma case, *Graham v. State*, in support of this premise. *Id.* Even if *Graham* stood for the proposition that Plaintiff claims it stands for (and it does not),[16] a state-court opinion cannot "clearly establish" that an officer's conduct violated federal constitutional or statutory rights. *See Callahan v. Unified Gov't of Wyandotte Cty.*, 806 F.3d 1022, 1027 (10th Cir. 2015) ("In this circuit, to show that a right is clearly established, the plaintiff must point to a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." (citation and quotation marks omitted)). Because Plaintiff has failed to point to any case law demonstrating that Officer Richards violated clearly established law by arresting Mr. McKee, Officer Richards is entitled to summary judgment on Plaintiff's illegal-arrest claim. *E.g., Rojas v. Anderson*, 727 F.3d 1000, 1005–06 (10th Cir. 2013) (affirming summary judgment based on the "sparsity of [the plaintiff's] argument and his failure to point to any authority to support his claims").

B

The Court now turns to Plaintiff's claim that Officer Richards used excessive force against Mr. McKee. An excessive-force claim is, in effect, a challenge to the reasonableness of an arrest or seizure. *See Thomas v.*

---

[16] Plaintiff cites *Graham v. State* for the proposition that, in general, "a police officer's authority cannot extend beyond his jurisdiction." Dkt. 77 at 35 (citing *Graham v. State*, 1977 OK CR 1, ¶ ¶ 13-14, 560 P.2d 200). But *Graham* says something else: "There are, of course, *exceptions* to the general rule that a police officer's authority cannot extend beyond his jurisdiction. *If a police officer is in hot pursuit of a person who has committed an unlawful act within his jurisdiction, then such police officer is, of necessity, permitted to go outside his jurisdiction* to apprehend such person." *Graham*, 1977 OK CR 1, ¶ 14, 560 P.2d at 203 (emphasis added) (quoting *United States v. Braggs*, 189 F.2d 367 (10th Cir. 1951)). *Graham* does not establish that Officer Richards—who pursued Mr. McKee into another jurisdiction after he committed an unlawful act in Skiatook—violated Mr. McKee's federal rights by doing so.

No. 23-cv-209

*Durastanti*, 607 F.3d 655, 663 (10th Cir. 2010). The use of even deadly force "is not unlawful if a reasonable officer would have had probable cause to believe that there was a threat of serious physical harm to himself or others." *Id.* at 664. The reasonableness of force used by an officer must be judged from the perspective of a reasonable officer standing in that officer's place. *Id.* Because Officer Richards has asserted the defense of qualified immunity, Plaintiff bears the preliminary burden of establishing that Officer Richards's use of force was not objectively reasonable, and that she was on notice of that fact at the time of the accident. The Court will address both requirements.

1

To establish that an officer's use of force violated the Fourth Amendment, a plaintiff must first show that a seizure occurred. *Thomas*, 607 F.3d at 663 (noting that a plaintiff "must show *both* that a 'seizure' occurred and that the seizure was 'unreasonable'" (quoting *Childress v. City of Arapaho*, 210 F.3d 1154, 1156 (10th Cir. 2000)) (internal citation omitted)). Officer Richards argues that she did not "unreasonably seize" Mr. McKee because she did not "seize" him at all; according to Officer Richards, the collision was an accident, nothing more, and that accidental conduct cannot give rise to a Fourth Amendment violation.

"Violation of the Fourth Amendment requires an intentional acquisition of physical control." *See Brower v. Cnty. of Inyo*, 489 U.S. 593, 596, (1989).[17] If, as Officer Richards claims, there is no evidence that she intended to seize, arrest, or use force against Mr. McKee, then Plaintiff cannot prevail on her Fourth Amendment claim as a matter of law. *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 844 (1998) ("We illustrated the point by saying that no

---

[17] *See also Lindsey v. Hyler*, 918 F.3d 1109, 1113 (10th Cir. 2019) (treating excessive force claim as a "seizure" subject to the Fourth Amendment's reasonableness requirement and recognizing that a seizure is "a governmental termination of freedom of movement *through means intentionally applied*" (quoting *Estate of Larsen ex rel Sturdivan v. Murr*, 511 F.3d 1255, 1259 (10th Cir. 2008))).

No. 23-cv-209

Fourth Amendment seizure would take place where a 'pursuing police car sought to stop the suspect only by [a] show of authority . . .' but accidentally stopped the suspect by crashing into him. That is exactly this case." (quoting *Brower*, 489 U.S. at 597)).[18] If, however, the evidence *could* permit a jury to find that Officer Richards acted intentionally, then the Court must evaluate the reasonableness of her conduct in light of Fourth-Amendment jurisprudence. *E.g., Osborn v. Meitzen*, No. CIV-20-96-SPS, 2021 WL 5495179, at *3 (E.D. Okla. Nov. 23, 2021), aff'd, No. 21-7069, 2022 WL 17428958 (10th Cir. Dec. 6, 2022).

Officer Richards argues there is no evidence that would permit a jury to find she intentionally hit Mr. McKee. *See* Dkt. 62 at 24, 25-30. In support of this position, she points to her own testimony that she did everything she could to avoid an accident, her post-collision statements describing the collision as an "accident" rather than a tactical decision, and data collected from the airbag control module on her vehicle, which indicates that Officer Richards applied her brakes and steered to the right, left, and back to the right in the moments prior to the accident.[19] Dkt. 62-6 at 21; Dkt. 62-8 at 8; Dkt. 62-11 at 18-19. Plaintiff, in response, argues that the evidence of Officer Richards's speed, acceleration, and position prior to the crash, the physical evidence at the scene of the collision, and Officer Richards's own statements

---

[18] Plaintiff does not dispute that intent is a necessary element of her Fourth Amendment claim for which she bears the burden of proof. *See* Dkt. 77 at 11 (arguing that, to survive summary judgment, she need only show that Officer Richards intended to hit, seize, or act on Mr. McKee through means intentionally applied).

[19] An airbag control module records data for the five seconds prior to the event that causes the airbag to deploy (or, in some cases, nearly deploy). It is not clear from the record whether the first collision with the trailer or the second collision with Mr. McKee is the "event" that corresponds to the recorded data. *See* Dkt. 62-11 at 18 (noting that the module "had one saved event record"). The Court, construing the facts and drawing all inferences in favor of Mr. McKee, assumes that the "event" recorded is the collision with Mr. McKee's motorcycle.

No. 23-cv-209

could permit a jury to conclude that Officer Richards deliberately hit Mr. McKee to end the pursuit.

Although this is a close case, the Court agrees with Plaintiff. Officer Richards's testimony shows that, for most of the pursuit, she followed three or four car lengths behind Mr. McKee. *See* Dkt. 62-3 at 10-12, 14, 21, 28, 32-33, 51). She closed that gap just prior to the collision, following approximately one car length behind Mr. McKee as she passed the barriers and entered the construction site. *Id.* at 59-60. There is evidence that Officer Richards was accelerating three-to-five seconds prior to striking Mr. McKee. Dkt. 62-11 at 18-19. And although the brake switch was activated one-and-a-half seconds prior to the collision, there is no evidence as to how much braking percentage was used by Officer Richards, nor is there evidence that officers investigating the collision found any skid marks indicative of sudden braking. *Id.* at 19; Dkt. 62-3 at 61. This evidence could be consistent with Officer Richards's claim that she suddenly and accidentally collided with Mr. McKee while trying to avoid a parked trailer; but it could also be consistent with Plaintiff's claim that Officer Richards made a tactical decision to forcibly end the chase once Mr. McKee entered the construction zone.

Officer Richards argues that her statements after the collision show that she did not intend to strike Mr. McKee. *See* Dkt. 62 at 26-29. But a jury could decide not to credit Officer Richards's statements based on the evidence discussed above. And as the Tenth Circuit has recognized, courts ruling on motions for summary judgment should exercise caution when considering the potentially self-serving statements of officers, particularly when the witness most likely to contradict the officer is dead and unable to testify. *E.g.,* *Pauly v. White*, 874 F.3d 1197, 1218 (10th Cir. 2017) (concluding that the evidence could support the conclusion that the victim did not fire his weapon at the officer, despite the officer's statement to the contrary).

No. 23-cv-209

Officer Richards also argues that there is no evidence that she discussed the possibility of using a tactical maneuver to end the chase prior to the collision. This supports Officer Richards's position, but it does not disprove Plaintiff's claim. Nor do Officer Richards's statements following the collision preclude a finding of intent. Although some of those statements suggest the collision was accidental, at least one statement could indicate that Officer Richards intended to "hit" Mr. McKee. Dkt. 62-8 ("I've been involved in an accident. Putting on brakes and *finally I hit him*. He hit me." (emphasis added)). And as Plaintiff notes, Officer Richards has made contradictory statements regarding the sequence of events giving rise to the accident.[20]

After considering all the evidence, the Court concludes that a question of fact remains as to Officer Richards's intent at the time of the accident. Accordingly, the Court declines to hold as a matter of law that no Fourth-Amendment seizure took place. The Court assumes, for purposes of this opinion, that Officer Richards intentionally struck Mr. McKee's motorcycle as he was slowing down to prevent him from fleeing further. The limited factual record and the critical question of Officer Richards's intent makes further analysis of the first prong of the qualified-immunity analysis difficult. Accordingly, the Court moves to the second step of the qualified-immunity inquiry: Whether Officer Richards's conduct violated Mr. McKee's clearly established federal rights. *Cf. Osborn*, 2021 WL 5495179, at *3 (resolving summary judgment under the second prong of the qualified-immunity analysis because the critical question of the officer's intent remained a question for the jury, and prevented the court from determining "whether the seizure, if it occurred, was reasonable").

---

[20] Although some of these contradictions could be explained away as innocent (and understandable) confusion following a traumatic event, the Court cannot draw inferences in favor of Officer Richards. Only a jury can do that. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

No. 23-cv-209

2

Even if Officer Richards intentionally struck Mr. McKee's motorcycle to stop him from fleeing, the defense of qualified immunity will shield her from liability unless her conduct was "unreasonable in light of clearly established law." *Henderson v. Glanz*, 813 F.3d 938, 951 (10th Cir. 2015) (citation and quotation marks omitted). To show that Officer Richards violated clearly established law, Plaintiff "must point to Supreme Court or Tenth Circuit precedents [o]n point, or to the clear weight of authority from other circuit courts deciding that the law was as the plaintiff maintains." *Thompson v. Ragland*, 23 F.4th 1252, 1255 (10th Cir. 2022). Plaintiff's burden is a heavy one, and it cannot be satisfied by references to high-level legal truisms. *See Ashcroft v. al–Kidd*, 563 U.S. 731, 742 (2011) (recognizing that "clearly established law" should not be defined "at a high level of generality"); *Albright v. Rodriguez*, 51 F.3d 1531, 1534-35 (10th Cir.1995) (describing the plaintiff's "heavy" preliminary burden). Instead, Plaintiff must point to law that is particularized to the facts of her case, *i.e.,* where "an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment." *White v. Pauly*, 580 U.S. 73, 79 (2017).

Plaintiff cites many cases in her brief, but most of her arguments consist of general applications of broad legal principles. *See* Dkt. 77 at 18-19, 20-25. Rather than describe how particular cases informed Officer Richards (and others) that it is unreasonable to stop a fleeing motorcyclist by striking him with a police vehicle, Plaintiff argues only that "the obvious case law of *Smith v. Cupp*, *Walker v. Davis*, *Harris v. Coweta Cty.*, *Reavis v. Frost*, *supra*, hold it is a 4th Amendment excessive force violation to hit a motorcycle with a police car, especially for misdemeanor traffic offenses such as reckless driving." Dkt. 77 at 41. The Court has reservations as to whether this recitation is sufficient to satisfy Plaintiff's burden. Nevertheless, the Court will consider whether these cases, together or separately, were sufficient to alert Officer Richards that her actions were unlawful.

No. 23-cv-209

The Court begins with *Reavis estate of Coale v. Frost*, 967 F.3d 978 (10th Cir. 2020), and *Smith v. Cupp*, 430 F.3d 766 (6th Cir. 2005). Both cases involved officers who shot at drivers attempting to flee, but neither involved a protracted, high-speed pursuit. *Reavis*, 967 F.3d at 991; *Smith*, 430 F.3d at 769. In both cases, the appellate court concluded that a jury could find that the officers fired their weapons knowing that there was no immediate threat of harm to the officers or others. *Reavis*, 967 F.3d at 991; *Smith*, 430 F.3d at 775. And in both cases, the court concluded that a reasonable officer would have known at the time that it was unlawful to fire at a fleeing vehicle that no longer presented a threat to the officer or anyone else. *Reavis*, 967 F.3d at 995; *Smith*, 430 F.3d at 777.

The Court finds *Reavis* and *Smith* to be of limited value. The Tenth Circuit has recognized that the term "deadly force" encompasses a spectrum of activity, some more likely to cause death than others, and that "just because a situation justifies ramming does not mean it will justify shooting a suspect in the head." *Cordova v. Aragon*, 569 F.3d 1183, 1189 (10th Cir. 2009).[21] An officer who read *Reavis* and *Smith* might have known that she could not shoot a motorist from behind when the motorist presented no risk to anyone and had not led vehicles on a high-speed chase through multiple jurisdictions; she would not have necessarily concluded that it would be unlawful to end a high-speed chase by ramming a fleeing vehicle as it entered a construction zone[22] in a residential area. Those cases would not have provided fair warning to Officer Richards that her conduct was unconstitutional. *Halley v. Huckaby*, 902 F.3d 1136, 1157 (10th Cir. 2018) (stating that, "while

---

[21] *See also Morrow v. Meachum*, 917 F.3d 870, 879 (5th Cir. 2019) (concluding that a collision is unlike a gunshot, and that cases involving shootings do not govern those involving collisions between officers' vehicles and other vehicles).

[22] Although not discussed at length by either party, the Court notes that the fact that Mr. McKee entered a construction area at high speed presented a unique risk of harm that cannot be lightly disregarded.

No. 23-cv-209

general statements of law can sometimes provide fair warning that certain conduct is unconstitutional, they only do so if they 'apply with obvious clarity to the specific conduct in question'" (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997))).

Next, Plaintiff cites *Harris v. Coweta County, Georgia*, 406 F.3d 1307 (11th Cir. 2005). In that case, the court of appeals initially held that it was well-established by 2001 that an officer could not use deadly force—including ramming another vehicle at high speed—when the fleeing suspect was neither armed nor dangerous. *Id.* at 1320-21. The court of appeals issued a substitute opinion with a similar holding. *See Harris v. Coweta County, Georgia*, 433 F.3d 807, 820-21 (11th Cir. 2005). But the substituted opinion was reversed by the Supreme Court, which held that the court of appeals erred when it assumed that the fleeing suspect did not present a danger to others. *Scott v. Harris*, 550 U.S. 372, 380 (2007). The Court noted that a video depicted the suspect "racing down" narrow roads at night, swerving around cars, crossing the double-yellow line, and running red lights in a manner that "plac[ed] police officers and innocent bystanders alike at great risk of serious injury." *Id.* at 379-80. In view of the risk presented by the suspect, the Court held that it was *reasonable*, and not a constitutional violation, for the pursuing officers to ram the suspect's vehicle even though doing so created a "high likelihood of serious injury or death" to the suspect. *Id.* at 384.

The version of *Harris* cited by the Plaintiff could not have put Officer Richards on notice of the fact that her actions were unreasonable. That case is no longer good law, and the opinion reversing it, *Scott v. Harris*, demonstrates that there are cases where it is acceptable to ram a fleeing vehicle notwithstanding the risk created to the vehicle's occupant. *Id.* Neither *Harris*'s now-invalid holding nor *Scott* would have put Officer Richards on notice of the fact the Fourth Amendment prohibited her from striking Mr. McKee's motorcycle with her police cruiser.

No. 23-cv-209

Finally, Plaintiff cites *Walker v. Davis*, an opinion from outside of the Tenth Circuit. 643 F. Supp. 2d 921 (W.D. Ky. 2014), *aff'd*, 649 F.3d 502 (6th Cir. 2011). That opinion cannot, by itself, show what was "clearly established" at the time of the facts giving rise to this case. *See Callahan v. Unified Gov't of Wyandotte Cty.*, 806 F.3d 1022, 1027 (10th Cir. 2015) (requiring plaintiffs to "point to a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts" to demonstrate that the unlawful nature of an officer's conduct was "clearly established" (citation and quotation marks omitted)). Furthermore, the facts of *Walker* are unlike the facts presented here: In *Walker* the pursuit never exceeded sixty miles per hour and ended in a field; here, the pursuit exceeded 100 miles per hour, proceeded through one of Oklahoma's largest cities, and ended in a construction zone. *Walker*, 643 F. Supp. 2d at 926, 932. The court's determination that it was unlawful to ram the fleeing motorcycle under the circumstances presented in *Walker* did not clearly establish that Officer Richards should have known she could not ram Mr. McKee's motorcycle under the very different circumstances she was presented with.

The cases cited by Plaintiff, whether considered individually or collectively, fail to show that the unlawfulness of Officer Richards's conduct was clearly established at the time of the alleged constitutional violation. And the Court's own research shows that the question of whether and when an officer may ram a speeding motorcycle is fact-specific and not easily resolved by a clear set of rules. The Tenth Circuit has recognized that a motorist's reckless driving creates a "substantial but not imminent risk" to innocent bystanders even when there are "no other motorists in the immediate vicinity." *Cordova*, 569 F.3d at 1189. Whether the "risk imposed on innocent bystanders and police by a motorist's reckless driving justifies . . a level of force that is nearly certain to cause the motorist's death" is "not an easy question, or one that any court could feel confident in answering." *Id.* And the Court could find no case law within the Tenth Circuit directly addressing how that question

17

No. 23-cv-209

should be resolved when an officer uses a pursuit intervention technique against a motorcycle that has sped through a major city and into a construction zone.

There are some opinions outside of the Tenth Circuit involving facts that are similar to those presented here. But those cases are in tension with one another. For example, the Fifth Circuit has held that, as of 2014, it was not clearly established that an officer would violate the Fourth Amendment by using a "rolling block" to stop a fleeing motorcyclist who had been travelling at speeds of 100 miles per hour or more on a two-lane road with "light but consistent traffic." *Morrow v. Meachum*, 917 F.3d 870, 873 (5th Cir. 2019).[23] The Sixth Circuit held in 2016 that an officer could *not* use his vehicle to stop a fleeing motorcyclist who had been speeding in excess of 100 miles per hour when the collision occurred at 4:20 a.m. on a divided highway with "no pedestrians or businesses in sight." *Stamm v. Miller*, 657 F. App'x 492, 495 (6th Cir. 2016). And the Fourth Circuit held in 2007 that a police officer acted reasonably when he intentionally rammed a motorcycle at the end of an eight-mile chase during which he committed numerous traffic violations. *Abney v. Coe*, 493 F.3d 412, 416-17 (4th Cir. 2007).

These cases do not establish, by the clear weight of authority from outside this circuit, that Officer Richards's conduct was clearly unconstitutional at the time of the accident. If anything, these cases show that the question of whether and when an officer may ram a motorcycle is a fact-specific question ill-suited to resolution on qualified immunity grounds in all but the clearest of cases. Although Plaintiff believes that Officer Richards should have been "forced to decide—with life-or-death consequences for innocent motorists,

---

[23] Earlier, the same court held that it was reasonable for an officer to "bump" a fleeing car that had failed to observe a stop sign and fled down a rural, two-lane road at speeds exceeding ninety miles per hour because of the threat the fleeing vehicle posed to anyone he might have encountered. *Pasco ex rel Pasco v. Knoblauch*, 566 F.3d 572, 581 (5th Cir. 2009).

No. 23-cv-209

in [mere] seconds, and upon pain of personal liability"—whether her chase was more like *Morrow*, *Stamm*, or *Abney*, "[s]ection 1983 does not put [Officer Richards] to that choice." *Morrow*, 917 F.3d at 880. Neither does this Court. The cases cited above show that "this area is one in which the result depends very much on the facts of each case," and they "by no means 'clearly establish'" that Officer Richards's conduct violated the Fourth Amendment. *Brosseau v. Haugen*, 543 U.S. 199, 201 (2004).

Plaintiff has failed to show that Officer Richards violated clearly established law by striking Mr. McKee. As a result, Officer Richards is entitled to summary judgment on Plaintiff's excessive force claim. *See Cordova*, 569 F.3d at 1193 (granting qualified immunity where the law was "vague" as to whether potential risk to unknown third parties could justify the use of force nearly certain to cause death); *Morrow*, 917 F.3d at 879 ("Cases cutting both ways do not clearly establish the law.").

C

Plaintiff next purports to bring a deliberate indifference claim against Officer Richards. Dkt. 77 at 36-37. To the extent she successfully alleged this claim,[24] is foreclosed by binding precedent unless Plaintiff can show that Officer Richards *intended* to harm Mr. McKee.[25] Assuming Plaintiff can prove this element, her deliberate-indifference claim is subject to the same qualified immunity defense as the other constitutional claims raised by Plaintiff. *See Green v. Post*, 574 F.3d 1294, 1304 (10th Cir. 2009) (applying qualified

---

[24] Officer Richards argues that this is a new claim not adequately set forth in Plaintiff's original complaint. Dkt. 962 at 16. The Court assumes, without deciding, that this claim is adequately alleged.

[25] *See County of Sacramento v. Lewis*, 523 U.S. 833, 854 (1998) ("Just as a purpose to cause harm is needed for Eighth Amendment liability in a riot case, so it ought to be needed for due process liability in a pursuit case. Accordingly, we hold that high-speed chases with no intent to harm suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment, [that can be redressed] by an action under § 1983.").

No. 23-cv-209

immunity to deliberate-indifference claim). Plaintiff has failed to point to any case law demonstrating that, at the time of the collision, it was "clearly established" that Officer Richards's conduct violated the Fourteenth Amendment. Because Plaintiff has not satisfied her burden, Officer Richards is entitled to summary judgment on Plaintiff's deliberate-indifference claim.

## IV

The Court next considers Plaintiff's claims that the City is responsible for Officer Richards's wrongful arrest and excessive use of force against Mr. McKee. Plaintiff sets forth several reasons why the City should be held liable for Officer Richards's conduct: First, she claims that the City's policies and procedures were the moving force behind Officer Richards's conduct. Second, she argues that the City failed to provide adequate training and supervision on the handling of minor arrests and police pursuits. Dkt. 2 at ¶¶ 14-27. Third, she alleges that the City ratified Officer Richards's conduct by failing to discipline her appropriately. The Court will address each theory in turn.

## A

The Court begins with Plaintiff's claim that the City's policies and procedures caused Officer Richards to violate Mr. McKee's constitutional rights. *See Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690 (1978) (holding that a local government can be sued directly under § 1983 when an unconstitutional action implements an official policy or regulation). To establish a viable claim under *Monell*, Plaintiff must first point to an underlying constitutional violation that the City is allegedly responsible for. *See Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 782 (10th Cir. 1993) (recognizing that, if there is not sufficient evidence for a jury to find an underlying constitutional violation, then there is no basis for imposing municipal liability under § 1983). Plaintiff cannot make this showing with respect to her illegal arrest claim because, as the Court recognized in Section III(A), *supra*, the evidence of record would not permit a jury to find that Officer Richards illegally arrested Mr. McKee in violation of his Fourth-Amendment rights.

No. 23-cv-209

A different situation is presented by Plaintiff's excessive-force claim because the Court did not find, as a matter of law, that Officer Richards acted reasonably when she arrested Mr. McKee. That question has been left open. Assuming Officer Richards acted unlawfully, the City cannot be held liable for her conduct simply because Officer Richards was employed by the City at the time she allegedly used excessive force. *See Bd. Of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 403 (1997). A municipality can be held liable for the unconstitutional acts of its employee only if the employee "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the municipality's] officers." *Monell*, 436 U.S. at 690. To ensure that a municipality is being held liable for its own conduct, rather than being held liable for the torts of its employees under a respondeat superior theory, a plaintiff seeking to hold a municipality liable for an officer's wrongdoing must show that (1) an official policy or custom (2) caused the plaintiff's injury, and (3) was "enacted or maintained with deliberate indifference to an almost inevitable constitutional injury." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013).

Plaintiff points to two policies that allegedly gave rise to Mr. McKee's death. First, she notes that the City's policies permitted officers to engage in tactical vehicle interventions and ramming to end police chases. Second, she argues that the City had an ongoing practice of allowing officers to engage in high-speed pursuits outside city limits. Plaintiff has failed to establish that either policy caused Mr. McKee's injuries or was adopted with deliberate indifference to a risk of constitutional harm.

The City's policies on pursuit intervention techniques are not causally connected to Mr. McKee's injuries. Although the Skiatook Police Department Policy Manual authorizes officers to engage in tactical vehicle interventions and ramming, it specifies that TVIs and ramming should only be used

No. 23-cv-209

in certain limited circumstances. Dkt. 63-1 at 16.[26] Plaintiff does not argue that Officer Richards acted in accordance with those constraints. Instead, she argues that Officer Richards rammed Mr. McKee's motorcycle even though the City's policy would not have allowed her to do so under the circumstances presented.[27] The City's policies, which did not authorize Officer Richards to intentionally ram Mr. McKee, could not have been the causal "moving force" behind Mr. McKee's death. *Schneider*, 717 F.3d at 770 (recognizing the plaintiff's obligation to show that a municipal policy or custom was the "moving force" behind an alleged constitutional violation); *Smith v. Rogers Co. Crim. J. Auth.*, No. 05-cv-0138-CVE-SAJ, 2005 WL 3298981, at *4 (Dec. 5, 2005) (holding that "it was not a policy that placed plaintiff at risk of a fall, but rather [the] individual jailers' failure to designate plaintiff as disabled" and in need of accommodations offered under the defendant's policies).

There is likewise no evidence that the City's purported practice of permitting its officers to go on high-speed chases outside of city limits caused Mr. McKee's injuries. Assuming for argument's sake that this policy can be inferred from the evidence of record, Plaintiff has not identified evidence that the policy was causally connected to Mr. McKee's injuries. Plaintiff has not pointed to a single high-speed chase (other than the one at issue in this case) that culminated in an alleged constitutional violation. In fact, the evidence

---

[26] According to the policy, TVIs may be used only by "properly trained officers with the approval of a supervisor" following an assessment of the risk of injury to officers, the public, and the occupants of the pursued vehicle. Dkt. 63-1 at 16. Ramming may be performed only if the fleeing suspect is "an actual or suspected felon who reasonably appears to represent a serious threat to the public if not apprehended" and is driving in a willful, reckless, or life-endangering manner. *Id.* The Court notes that these policies are generally aligned with current case law governing the permissible uses of force. Where a policy is itself not unconstitutional, the causation requirement should be "applied with especial rigor." *Schneider*, 717 F.3d at 770 (citation and quotation marks omitted).

[27] *See* Dkt. 63-1 at 16 (recognizing that ramming should only be used when the suspect is an actual or suspected felon who represents a serious threat to the public); Dkt. 89 at 18 (additional statement of fact no. 12) (asserting Officer Richards only had probable cause to believe Mr. McKee had been speeding and had run a stop sign).

No. 23-cv-209

demonstrates that most of the City's high-speed chases ended peaceably and without any constitutional harms. *See* Dkt. 63 at 10 (statement of fact no. 5).[28] Plaintiff provides no evidence or explanation as to how the City's decision to permit chases outside of its jurisdiction "sen[t] a message that dissimilar conduct, like the use of . . . force in this case, is tolerated." *Finch v. Rapp*, 38 F.4th 1234, 1246 (10th Cir. 2022). Absent such evidence or analysis, Plaintiff cannot "meet the demanding standard of causation" required in municipal liability cases. *Id.* (affirming summary judgment where the plaintiff pointed only to "a handful" of shootings that arguably gave rise to constitutional violations, none of which were factually similar to the incident on appeal).

Even if Plaintiff could establish that Mr. McKee's injuries were the product of either of the policies discussed above, there is no evidence that would permit a jury to find that the City was deliberately indifferent to the risk that its policies were "enacted or maintained with deliberate indifference to an almost inevitable constitutional injury." *Schneider*, 717 F.3d at 769. There is no evidence that the City was aware of a pattern of other, similar constitutional violations, which is "ordinarily necessary" to satisfy the "stringent deliberate indifference standard." *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1285 (10th Cir. 2019) (citation and quotation marks omitted). And Plaintiff has not shown that this is the rare case where deliberate

---

[28] According to the City, Skiatook officers had been involved in ten pursuits outside of Skiatook in the three years prior to Mr. McKee's death. Dkt. 63 at 10. Of those, six were terminated due to safety concerns, three ended after the fleeing driver became stuck or disabled, and one ended when the Oklahoma Highway Patrol (not the City) employed stop sticks. *Id.* at 10-11. Plaintiff states she cannot admit or deny these factual allegations and asks the Court to disregard this evidence. But if the Court ignores this evidence, there is even less evidence to support Plaintiff's claim that the City had an unofficial policy of permitting high-speed chases outside of its jurisdiction, as Plaintiff did not point to any other evidence of chases that resulted in constitutional violations. *See* Dkt. 89 at 16-19. At most, she refers to "16 high speed pursuits outside the Skiatook city limits in the 5 years prior to this incident." Dkt. 89 at 11. But she does not provide any evidence suggesting that those pursuits violated the Constitution, federal law, or even the City's own policies.

No. 23-cv-209

indifference can be inferred without a pattern of prior constitutional violations. It would not have been plainly obvious to the City that, by adopting policies permitting pursuit interventions in limited circumstances and allowing high-speed pursuits in others, one of its officers would disregard an order to terminate a pursuit of a misdemeanant fleeing on his motorcycle and deliberately ram the motorcycle in violation of City policies as it slowed to a stop in a construction zone. *Id.* There is no evidence to support a finding that the City's policies were the driving force behind Mr. McKee's injuries, nor is there evidence that the City was deliberately indifferent to the risks associated with those policies.

B

The Court next turns to Plaintiff's claim that the City failed to train Officer Richards regarding high-speed pursuits, tactical vehicle interventions, and ramming. There are "limited circumstances" under which a municipality can be held liable for failure to train its employees under § 1983, and a claim for municipal liability is "most tenuous" when it turns on such a failure. *Connick v. Thompson*, 563 U.S. 51, 61 (2011); *George, on behalf of Bradshaw v. Beaver Cnty., by & through Beaver Cnty. Bd. of Commissioners*, 32 F.4th 1246, 1253 (10th Cir. 2022) (citation and internal quotation marks omitted).

A municipality's failure to train its officers gives rise to § 1983 liability only when the failure is tantamount to deliberate indifference toward the rights of those the untrained officers come into contact with. *George*, 32 F.4th at 1253. Deliberate indifference "requires proof that a municipal actor disregarded a known or obvious consequence of his action" by, for example, maintaining a deficient program despite having actual or constructive notice that the "training deficiency caused city employees to commit constitutional violations." *Id.* (citation omitted). Ordinarily, a pattern of violations that precedes the challenged conduct is necessary to establish deliberate indifference; exceptions arise only where the "unconstitutional consequences of a failure

24

No. 23-cv-209

to train are highly predictable and patently obvious." *Id.* (quoting *Waller*, 932 F.3d at 1285).

There is no evidence of a pattern of constitutional violations that predates Mr. McKee's death. Although there is some evidence that other City officers have engaged in high-speed chases, there is no evidence that any of those chases involved the allegedly unconstitutional use of a vehicle to end a pursuit. Dkt. 63 at 10; Dkt. 89 at 11. And there is no evidence of any other incident in which an officer used a patrol car to ram or otherwise seize a fleeing suspect. *Cf.* Dkt. 63 at 11. Plaintiff's oblique references to high-speed chases, without more, cannot establish that the City was deliberately indifferent to the risk that its deficient training would give rise to constitutional violations.

The Court disagrees with Plaintiff's suggestion that it would have been "obvious" to the City that its officers might use cars to unconstitutionally seize fleeing misdemeanants without specific training to the contrary. The City maintained policies on vehicle pursuits, pursuit interventions, and the appropriate use of force. Dkt. 63 at 9; Dkt. 63-1 at 6-27. Those policies prohibited officers from using ramming or other pursuit intervention techniques except in limited circumstances. Dkt. 63-1 at 15-17. All City officers were required to read, understand, and comply with those policies, and the City required officers to complete daily training bulletins relevant to its policies and procedures in addition to their other training requirements. Dkt. 63 at 9. It would not be "plainly obvious" that an officer who read these policies would violate them by ramming a fleeing suspected misdemeanant. *Cf. George*, 32 F.4th at 1253-54 (affirming summary judgment where the evidence showed that all officers had access to the county's handbook and were required to participate in ongoing training regarding the implementation of those policies). The Court finds that the evidence is insufficient to support a jury verdict on a failure-to-train theory.

No. 23-cv-209

## C

The Court now turns to Plaintiff's claim that the City ratified Officer Richards's conduct by failing to investigate and discipline Officer Richards for using excessive force. A "municipality will not be found liable under a ratification theory unless a final decisionmaker ratifies an employee's specific unconstitutional actions, as well as the basis for these actions." *Bryson v. City of Oklahoma City*, 627 F.3d 784, 790 (10th Cir. 2010). The evidence of record fails to provide any evidence that would permit a finding of ratification here. The City investigated Officer Richards's conduct and, rather than condoning those actions, disciplined her for violating the City's policies. Dkt. 63 at 11 (statement of fact no. 9); Dkt. 89 at 14. Although the City did not separately discipline her for any alleged constitutional violations, that failure is not the equivalent of an express approval of Officer Richards's actions and the basis for them. The record is insufficient to permit a jury to find that the City ratified Officer Richards's allegedly unconstitutional conduct.

## V

Finally, the Court turns to Plaintiff's state-law assault claim against Officer Richards. Officer Richards argues that there is no evidence that she intended to hit Mr. McKee, and that the Oklahoma Governmental Tort Claims Act shields her from liability. Dkt. 62 at 41-42. Plaintiff responds only to the first of these two arguments. Dkt. 77 at 42.

The Court has already held that there is evidence that could permit a jury to find that Officer Richards intentionally collided with Mr. McKee's motorcycle. Thus, this case will proceed to trial unless the OGTCA bars Plaintiff's assault claim. But neither Plaintiff nor Defendant has fully developed this issue, which is now the only one remaining for the Court's consideration. Rather than direct the parties to provide additional briefing, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining assault claim. The question of whether the OGTCA bars recovery is a state-specific claim best addressed in state court. *See Smith v. City of Enid ex rel. Enid City*

No. 23-cv-209

*Comm'n*, 149 F.3d 1151, 1156 (10th Cir. 1998) (recognizing that, when all federal claims have been resolved, "the court may, and usually should, decline to exercise jurisdiction over any remaining state claims").

### VI

For the reasons discussed above, the Court holds that Officer Richards is entitled to qualified immunity with respect to the federal claims asserted against her. The Court further holds that Plaintiff has failed to demonstrate that the City is liable for any of the constitutional claims asserted against it, and the City is therefore entitled to judgment as a matter of law on all of Plaintiff's constitutional claims. This leaves Plaintiff's state-law assault claim pending against Officer Richards, and the Court declines to exercise jurisdiction over that claim. For all these reasons, Defendants' motions for summary judgment [Dkts. 62, 63] are granted.

DATED this 12th day of September 2025.

JOHN D. RUSSELL
*United States District Judge*